And Mr. Goroff, whenever you're ready, we'll hear from you. Okay. Thank you, Your Honor. I still have a few minutes to say good morning, Your Honors, and may it please the Court. Your Honors, established law holds that courts should be loathe to second-guess a company's enforcement of its compliance program, especially one in a highly-regulated industry, because those who oversee such programs must have flexibility to impose different punishment         Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Here, the District Court committed reversible error in finding plaintiff and her male comparator supervisor were similarly situated for purposes of her gender discrimination claim when, as a matter of law, they were not, and by finding pretext when there was none. And the Court compounded that error by imposing punitive damages when a Lincare employee merely followed standard practice in advising a regulator that plaintiff's license had expired based on information on the regulator's own website. If I may begin with the question of similarly situated and look first at plaintiff's conduct. Only plaintiff used cloned progress notes. These are notes in patient's medical records that are the same from one patient to another. In this case, Lincare's Chief Compliance Officer, Jennifer Peterson, learned through an audit of ventilator orders coming from its Parkersburg, West Virginia center that identical handwritten progress notes appeared in electronic medical records of multiple patients made by multiple doctors that indisputably violated Lincare's compliance program. Medicare strongly cautions against using cloned notes to support medical necessity for equipment, especially when reimbursement is sought. And that's just because I'm going to cite to the appendix, and I'll call it A, so that's at A998. This was so serious that Peterson and Lincare Senior Corporation Council and its National Healthcare Service Manager flew to West Virginia to investigate. There they interviewed plaintiff and learned she possessed the exact same cloned notes seen in the audit. She kept 17 templates of these in a binder in the trunk of her car. That's at A919. She admitted using them, including personally handing these out to physicians, which they then signed. That's A920. She admitted doing so for one-and-a-half to two years. That's A937. She admitted Lincare believed using... Can you say that, and they signed? Were they able to be signed without filling in the necessary information? They were like go-bys, right? They were templates. They weren't signed as she provided them, right? The text was signed, but you're correct, and actually, that's one of the points I want to call to the court's attention when I compare the good chart note examples with the cloned notes. The cloned notes, you take the text and you plug it in by just filling in at the top, and you can find an example of this at A653, the patient's name, social security number, date of birth, address, phone number, physician name, and physician practice, but otherwise, it's the same. If you looked at Smith's... Are they hand... I just want to make sure I'm understanding the facts. These are handwritten notes, so they're taking what you call cloned notes, and then they're handwriting them out. They're basically copying it like a go-by, filling in the gaps. Well, actually, no. The medical information is pre-written, and in this case, it's pre-written by the medical practices themselves. Ms. Balderson, plaintiff, her violation was that she used and kept these. She had them at the ready in the trunk of her car, and she would give them to physicians, and then they would sign them, and then she would use this to process their order for ventilators. She had no authority, ability, right under the compliance program to be doing that. Only she used cloned notes. Mr. Brady, her comparator, did not. Do you have in the record an example of a cloned note and then the submitted signed document? I do, yes. In fact, I'm hoping to focus a lot on the difference between Defendant's Exhibit 12, which begins at A651 and goes through A650. A651, okay. Yes. I'm omitting the zeros. A00651 to 655. And I'm contrasting that when I'm done, with Your Honor's permission, with A00656, which is the examples of the good chart notes Mr. Brady used. So if we, since Your Honor's question is on the note itself. Notes were a diagnosis, basically, wasn't it? A canned diagnosis? Yes. In other words, instead of- There was no fill in the blanks in the notes. The note was totally prepared and all the physician had to do was to sign it. Exactly. Sign it, fill in the name of the particular patient. And since he wanted reimbursement or facilitate reimbursement, he signed whatever she presented. Correct. She came with these notes- And that violated the standards of the company, as well as Medicare? Well, it violated the standards of the company. One of the issues, Medicare made no determination that it actually violated the law in any kind, but it absolutely, indisputably violated the most sacred of the compliance program standards. So only she did that. And if I may stay with Defendant's Exhibit 12, she did more than just present these to be signed. All right, so can you show me at 651, what is the piece that the plaintiff provided? Okay, so the plaintiff, who her name is Chandra, so it says from Chandra, sent a four-page fax and the cover of the fax, excuse me, Your Honors, begins with three violative statements that she wrote. These are hers. I need face-to-face notes with the last six months that met- This isn't the- I'm sorry, I get this point, but this is a separate issue than the 19 go-bys that she had. What I think of as go-bys, because I'm a lawyer, right? That's the phrase we use. But I understand this, but that's separate from the 19 that she had in the trunk of her car. That's what I'm trying to see. Right, so the- Can you show me one of the 19 and where it was applied? Sure. The ones that were submitted are in Defendant's Exhibit 9, and let me see if I can get to that quickly. That's at A609. They begin, and then there's 19 of these, and if you look, you see a series from this Camden-Clark Medical Center, and they're identical. The patients are different. The dates are different. Many of them- But the text, as Judge Niemeyer said, is absolutely identical. So, counsel, to be clear, the handwriting on 609 through 615 forward, that's Ms. Balderson's handwriting? No. No, Ms. Balderson did not create these notes. The handwriting on 609 forward, the testimony is, was from people at the medical practices. She said that she kept these, which was a violation of the policy, and she used them. She would come, and she would hand them to physicians, she said, to help them out, and they would sign, and she would take, and she would shepherd their order through. So her, we are, her violation was not to draft these, it was to keep and use them. But Medicare, physicians get to make the choice. But Medicare cautions them in its guidance, and we cite this at footnote 7, page 11 of our brief, cautions them not to do so, or to be very wary in doing so, when you're doing claims of reimbursement. And so only she used cloned notes. The important point for your case, though, is that it violated, to do that, whether it's a good rule or not a good rule, I think it's probably a good rule, because it, it tends to make individualized treatment requirements universal, when they really aren't. It tends to deceive the system. But the problem for you, I mean, the fact for you is that it violates your ethical standards. Printed ethical standards. Is that right? That's absolutely correct, your honor. And that's why she was disciplined. Absolutely, your honor. And there's, she does not question that. She questions that she was terminated when her supervisor was not. And if we can. So I understand. It violates her, your policy, because it's leading. It's like a leading question, right? It's saying, hey, here's basically the information that you need to give me so that I can get you reimbursement. That's the principal reason, although there could be different forms and degrees of leading. But it's also, it also, in her case, did other things. It was doing a favor for someone who's a referral source, which is another violation. And that wasn't the reason that your client gave when they fired her. They fired her for leading. The testimony was that she was told that she was fired for leading through the use of her progress notes. That's what Ms. Balderson testified. She admitted that the leading as to her was with regard to progress notes. Okay. And the leading part of that is that she's leading them by saying, here's the information you need to give me in order to get reimbursement. Exactly. Okay. And it wasn't individualized. It was, it was cloned. Exactly. And the doctors don't give it individualized attention because they want the devices and whatever it takes, they signed. Well, we can certainly say that they signed it and didn't give it individualized attention. I won't speculate as to the motives of the doctors. But the policy is designed not, is in time, tried to create an individualized need as opposed to a cloned need. So if we may turn to Mr. Brady, the alleged comparator, Defendant's Exhibit 13 is what he did. It's A656. And he gave three examples, good chart note examples. And if you were to look at that chart and compare it with the clone notes, you'll see first these are typed. You'll see second, these are all on one page. You'll see third, these are said to be examples. And Mr. Brady testified he never used clone notes. Ms. Balderson agreed he never used clone notes. He testified, you know, Medicare allows for educational materials such as this. Why is it not just as leading, right? So one example, I mean, to me, I guess I'm having a hard time understanding why based on the policy, right, I understand that they are different, but they are both equally leading, right? In one instance, you've got somebody saying, here's something you wrote, you, physician's criteria, and so I'm showing that to you and that's leading. Here's the other hand, the guy saying, here's something I wrote, but if you copy this back to me, it meets the requirements, right? So in both instances, from a leading perspective, it might have other problems, but I want to stay focused on the question of is the one more leading than the other, they strike me as equally leading. The critical difference is that clone notes are used with actual patients. If you look at all of the clone notes. But still are the good chart notes. No, they are not. I think the whole point is. They are not. I'm sorry to interrupt you. No, no, because the testimony was, is that, the trial testimony was that the language from the notes ended up in a number, we don't know how many, patient charts. So they copied this language into the patient charts the same way this language was put into the patient chart. Well, first of all. 609. First of all, that would be, what Mr. Brady said, is he never directed a physician to do so. He didn't ask physicians to do so. He had no role in. Wait, wait, wait, I'm sorry. So if I tell you, hey, this is what's good, I've got no idea that you're going to use it. I mean, that's, that's like hard to get my head around, right? I mean, if we, if we say, here's the order, this is what, you know, we, we expect you to provide. Like, we're implicitly saying like, provide us this. No, we're not, your honor. If I say, put this into David Goroff's progress note, into his patient chart that is submitted to Medicare for reimbursement, that is very different from saying, examples, I'm training you on the kind of language that you would use to try to convince an insurance company to provide coverage for your patient. All of these have to be modified. They speak, for example, of CPAP slash BiPAP, if you look at 656. Those are two separate devices. You'd have to, you couldn't just verbatim copy these, and that's what Mr. Brady said. These were not plug and play. They couldn't just be put into a patient record. A physician would have to think about it, modify it, and make the ultimate election. If you, if you look back at the DX12, Fenton's Exhibit 12, Ms. Balderson is saying, I need you to do this. I need you to sign this. I went ahead and I changed the, the, the document. I went ahead and filled this in. That is actively being involved in a patient record, and it resulted in an error. It resulted in something that said a patient had conditions they didn't have. Mr. Brady did no such thing, and more importantly, this is a gender discrimination case. The question is, did Lincare have a reasonable basis to believe this was different, such that his, what he did was of lesser magnitude? And it absolutely, if you look at these two, and you look at her direct involvement, that shows that there's absolute justification. And Ms. Peterson testified she always, always punished use of clone notes with termination. And she did so with men over the years. And there was no evidence to the contrary of that. And you know, in addition, I obviously want to preserve on, on punitive damages. The court, you shouldn't get there because of liability, but the court also did, looked at a different decision maker, it was Sandra Moreau versus Jennifer Peterson, who acted post-termination based on information that was provided by the regulator, which was incorrect. And all of judge, the district court's findings of indifference and hostility and actual malice were based on the fact that there was an assumption that Lincare knew that the regulator had made a mistake in its, in its website when the notification the regulator provided did not go to any of the decision makers, they did not know about it until the case began, so it amounted to strict liability. And I also see my time is up. I'll respond in rebuttal to the after-acquired evidence argument I expect the opposing counsel to make. Thank you very much. Thank you. Mr. Robbery. If it may please the court, Andrew Robby, I represent Ms. Chandra Balderson, the plaintiff below. At the outset, I want to frame the issues. Lincare's not suggesting here that Chief Judge Johnston was acting under some, some misapprehension of law. Rather, Lincare is simply disagreeing with his factual findings and the weight afforded to particular evidence below. By attacking these factual underpinnings, Lincare is necessarily trying to retry this case on appeal based on the pages of a cold record. We need to be mindful of the standard of review here, which is a narrow one. If the district court's findings were plausible in light of the record as a whole, and they need only be plausible, then this court must affirm even if it, sitting as the trier of fact, would have decided differently. Let me ask you this. This is the part that gave me the greatest difficulty. The only evidence of discrimination that the district court gave, it was a single sentence, it says, is that she was a woman and the other person was a man, and they were treated differently. And therefore, discrimination comes. Not only that, the testimony was by your client that there was no mention of gender discrimination in any of the discipline. She was always treated fairly as a woman. She was disciplined by a woman who had two women advisors, and she was replaced by a woman. And so the question is, is this sexual discrimination? Where's the evidence of it, except for the fact we have a man and a woman involved? So your honor, I'll start first with the standard. Under the McDonnell-Douglas standard, direct evidence... Just stick with my question. I understand the McDonnell-Douglas standard and the presumptions and the shifting presumption and all that stuff. But the idea is that at the end, you still have to find discrimination, deliberate discrimination based on the basis of sex. And my question is just, where in the record, other than the fact that one was a man and one was a woman, do we have evidence that there was discriminatory animus or any kind of discriminatory evidence? And I couldn't find any other than the fact, and the district court didn't list any, except the one sentence near the end of the opinion, that he relied on the fact that the main difference was two were treated as one was a man and one was a woman. That was the whole case. So direct evidence is not required in a case like this? I understand that, I understand, but I still want to know what evidence you have. If you say you don't have any, fine, you're relying on that. The evidence is disparate treatment and applying the company policy. Based on the fact that one's a woman and one's a man? That's correct. Okay. So then we move to the... The question is, that doesn't seem to appear to be the basis. In other words, what we have is a total women cast participating. You have the plaintiff, your plaintiff, contending that gender and sex in the workplace was never an issue until they dismissed me. And then when she was finally replaced, she was replaced with a woman. This... All right, you can go ahead and argue. That's my trouble. So the last part of your question, you mentioned that Ms. Balderson was replaced by a woman. It's important to note that the person accused of discrimination is not the one that hired Ms. Balderson's replacement. Your question also addresses what has been called the same group inference, this idea that females can never discriminate against other females. No, I don't suggest that. I suggest that there was no complaint she was treated hostilely because she was a woman. The fact is she was comfortable being a woman in that workplace. And not only that, she was disciplined by a woman. And the three came down to interview her. They were all women. The point is, this might be an unjust decision. This may be a decision where they treated people differently because he was higher up or had more responsibility or whatever, and they were showing favoritism. But the question is whether there was animus, discriminatory animus based on sex is really... It's about as blank as you can get. So hostility is not required. This is a single claim under West Virginia law, under the Human Rights Act. And West Virginia law recognizes a claim for disparate treatment. And our claim is that you have, over at LendCare, a uniform policy, and it was applied disparately across a protected class and a non-protected class. Under West Virginia law, that is more than sufficient to state a claim for disparate treatment. But ultimately, this comes down to weighing evidence. The fact that Ms. Balderson was terminated by a female... That's evidence, and the only evidence we have is that Balderson was a woman and Brady was a man. That's the evidence. It's the disparate treatment in the policy, and I think the disparate treatment is further highlighted by the facts that also gave foundation to the punitive damages. The punitive damages were... Can you talk to me for a second about the findings of pretext? So the district court seems to rely on two ideas. One is this notion that there was a shift in the explanation. And then second, there's a failure to report. On the shift in explanation, help me understand why that's actually a shift, right? Because your colleague, when we started talking about leading, immediately turned to the very things, this alleged misrepresentation and false documentation, that the district court found wasn't about leading, that it was something else as opposed to a subclass of leading. Help me understand why that's... Why I should not think about the misrepresentations that are alleged here as really a subclass of the leading that was being done. It was happening because of the manner in which she was leading the physicians. So, I mean, your question raises an important point. And below at the trial, the distinction was not some distinction between templates or good chart note examples. At the time she was terminated, all the conduct was commonly characterized as leading. When Ms. Broderson was terminated, she was told she was being terminated for leading. We served a discovery request. I understand, but why isn't the later discussion about the misrepresentation and false documents part of that broader category of leading, right? That that resulted from the leading. That was a consequence of leading, not a shifting explanation. I don't see that as a shifting explanation. That's what I'm trying to get at. I understand you want to talk about something different, but stay focused on that piece for me. The district court found that there was no misrepresentation. So regardless of whether the explanation was changing, the district court looked at the facts. There's a facts that Lynn Kerr... Right. They found there's no... But what was there was leading, right? So maybe it resulted in misrepresentation. Maybe it didn't. The point is the whole idea there was leading, right? And so none of that seems to be a shift, right? The district court wanted to say, oh, that's totally different, but that's all part of leading. I agree with you. Leading is this sort of broader category, but it encompassed the subsequent allegations. And we've said in other cases that in instances where a second justification is fully consistent with the first justification, we can't use that to imply pretext. And that seems like exactly what the district court did here in violation of our prior precedent. So this is why we do not reweigh these factors on appeal. Chief Judge Johnston inquired at trial himself trying to draw out what is it Lynn Kerr is claiming are the distinctions here. And at trial, the true distinction Lynn Kerr was trying to raise was they're accusing her of federal crimes. And through a series of admissions, the district court found that this excuse was simply made for litigation and was not to be believed. But it's wholly consistent. Here's the problem. Assume for a minute it was true or false. It matters not whether what happened was misrepresentation and false. The point of it and the violation that occurs there is because she's leading. That's what leads to it. Right. So it's a subclass of leading. And we've said we're a rationale that's given is wholly consistent with the first rationale. We can't from that conclude there's pretext. If both Mr. Brady and Miss Balderson were leading, that's the same violation of corporate policy and the same punishment should get you there. Totally get. But what it doesn't do is get your pretext. All right. So let's I think we're good. That doesn't establish pretext. So now the second piece, he only relies on two things. The second thing he says is pretextual is they didn't report this to HHS. Help me understand why that shows that the reason they gave was false. It highlighted why Lynn Kerr was not credible. One of the subset categories of what they claim was the distinguishing factor was these misrepresentations, intentional misrepresentations. Under the corporate integrity agreement, Lynn Kerr was supposed to report any known or even suspected violations of federal health care law. Now, during discovery, Lynn Kerr's corporate representative said she definitely violated the False Claims Act, and she probably violated the anti-kickback statute. They're accusing her of federal crimes. So the question to Lynn Kerr was, and this was in the deposition, and this is at trial, you're accusing her of federal crimes. Did you report this? The kickback statute? How did she violate the kickback statute based on allegations? Well, they claimed somehow using these templates was a violation of the anti-kickback statute in the deposition testimony. They ran away from that at trial. But this is all to say Chief Judge Johnston, the finder of fact, just could not believe any excuse they were providing, and that's a credibility determination. No, but he gave two very reasons, right? So one, if he just said, listen, I heard the witness talk, and that guy came across like a liar. All right, that's a strong credibility point, but he's raising two specific arguments, right? And so we defer to his factual findings, but we don't sort of blindly look at the conclusions he's drawing that a failure to self-report means that you're acting pretextually. Like, that's the part that I'm not – like, the fact that I don't turn myself in, like, doesn't tell me a whole lot about whether I did it or didn't do it. So the fact that they did not report what they say were suspected violations gives rise to two possibilities. The first is that there are material breaches of this corporate integrity agreement, which has the risk of excluding them from federal health care programs. The second possibility, and the one Judge Johnston found most likely, was that the excuse was totally disingenuous. So by – I'm sorry. The excuse being leading? That it had nothing to do with leading? Correct. So leading – That's the conclusion you draw from that. They said leading – I think that's a reasonable – I just want to make sure I'm understanding. That's what you think the reasonable conclusion is. I'm sorry. Maybe I'm talking – we're talking past each other. If we could rewind. No, I mean, I'm fine. I just want to understand what your position is, right? What I'm trying to understand is what does the failure to report tell us? How can I get from that pretext? So leading was identified as a probable violation of federal health care laws. So Lincare could either report that if they thought that was seriously what was going on here, or they could not report it. And for not reporting it, that's why Chief Judge Johnston found that their excuse was disingenuous. If they truly believed that leading was somehow a violation of federal health care laws – So take me back to the finding – to the initial discharge. I thought when we talked about the discharge, she was discharged for violating the corporate policy, not for violating federal law. The corporate policy presumably is broader than the federal law. It's broader, but there is significant overlap. And at the time of – sorry. Heading into trial, Lincare was accusing her of both. The complaint did not – What are the two things there? The corporate policy and federal law? Correct. When you say federal law, is that written federal law or regulation? It's in statute. They accused her of violating both the anti-kickback statute and the False Claims Act. Well, why is it a false claim? We haven't gotten deep into whether that is an actual violation. The corporation could recognize a need to report because if they really had to report, I'm sure they would have. They concluded in their self-interest not to report because it could disqualify them. And this was an internal corporate matter that they were addressing and getting rid of the problem. So before Lincare was confronted with the existence of this corporate integrity agreement, they didn't realize we knew about it. That's when they were accusing her of violating these federal health care laws. It was only after they were confronted with this document that they said, well, we don't know if it's a violation or not, so it's not reportable. But importantly, under that agreement, they're supposed to report something that could possibly be. It doesn't have to be a known violation, but a problem. Can I back up and make sure I understand that? Your position is that Lincare was unaware of this agreement until you brought it to their attention? I'm not suggesting Lincare as a company didn't know about it. It sounds like they didn't, in which case we get even less out of their failure to do it. The people involved in this litigation, it sounds like what you're saying, didn't know about this. And so the fact that they failed to comply with something they didn't know about shouldn't tell us much about their state of mind. So their corporate representative was the chief compliance officer for the whole company. She certainly knew about this corporate integrity agreement. Indeed, I think she signed it, or at least notice was required to go to her under the agreement. So she knew about it. When she was providing testimony trying to draw a distinction between Mr. Brady's conduct, Ms. Watterson's conduct, she was freewheeling. She was like, you know what, this is different conduct because she was violating federal health care law. Only when confronted with that agreement did she change her tune. And she was confronted with that testimony. Chief Judge Johnston noted that issue and appropriately discounted her testimony as false. And that's, again, a credibility issue that should be afforded great deference on appeal. I see that my time is up. I will address my cross-appeal on rebuttal. All right, Mr. I guess Goroff, we have, yeah. Yes, thank you, Your Honor. We have five minutes, and I guess Mr. Roby gets another five. Because of the cross-appeal, although, yes. So if I may respond to one of the things that Mr. Roby said that I believe is inaccurate. Linker was never accusing Ms. Plaintiff of violating the actual statutes. The violations were of the compliance program. What he is referring to is there was a 30B6 deposition, and the notice of that is at page 28 of the appendix. And it did not, and Peterson was the representative. It did not include among the questions whether there were actual violations of law. Linker has in its policy, as Judge Richardson, you pointed out, a broader scope of prohibitions designed to ensure, you know, that no law is violated than the law itself. So things can violate Linker's compliance program without violating the law. And Ms. Peterson is, for 20 years, more than that now, a familiar expert as one can be in compliance. But she is not a lawyer, and there was never a determination made. So they have these set of topics, and they asked a series of questions in kind of staccato way, where we were talking about leading before, where the lawyer says, you know, did this violate the compliance program? Yes, it did. It was leading. Did that violate the compliance program? Yes, it violated this. Did this violate the compliance program? Yes. Did this violate the False Claims Act? And suddenly it went from the compliance program, the noted topic, to the violation of the law itself. And she continued in the yes, it did, yes, it did, yes, it did. When she looked at the transcript, she said, that's an inaccurate answer I gave because I'm not equipped to talk about the law. I wasn't, you know, noticed to talk about the law. And so what she did was she submitted errata, and then she also said, and this is very, very important, I am available at your wish to be deposed a second time about why I have changed my answers. And plaintiff's counsel elected not to do that. And had they thought it was true evidence of pretext, they could have grilled her all day about that. They chose not to. They forfeited that opportunity. And as to the corporate – Is that, to your knowledge, is that the only part of the record in which your client or your client's representative testified that this was a violation of the False Claims Act or the anti-kickback statute? That is my understanding, yes. And so as to the agreement, they didn't report it because they hadn't made a determination of scienter. They don't have to. Ms. Peterson testified that when Judge Johnston asked her that she would terminate someone irrespective of good faith. Their state of mind does not matter. They look at behavior. And importantly, Judge Johnston, in the opinion, said that there's no showing the plaintiff set out to commit health care fraud. Well, that seems to show that one can look at clone notes and all the various violations that the client found to be leading and come to a reasonable conclusion that that wasn't a violation of law because the judge did so here. And if the judge could do so here, then LendCare, without getting into their privileged communications and all that, can make its own judgment too without that being pretextual. Most importantly, there is nothing in any of this that goes to gender being the real reason or a fair inference from what was done. Since I guess I'm going first on their cross appeal because Mr. Roby said he'll address it next, but this involves after acquired evidence. There's no question that post-termination, for the first time, LendCare learned that plaintiff had stated that when she applied in 2015, in October of 2015, that there was no restriction on her license for Ohio, which she listed on her application. She checked that there was no restriction when in fact there was. And the application itself says that's cause for termination. And plaintiff admitted at page 60 of her opening brief that that was cause for termination. And LendCare's corporate representative stated that that warranted termination. That's page A1021 of the appendix. And LendCare said it absolutely violates LendCare policy. And she had a duty – one of her duties she was being hired for was to provide clean paperwork, to ensure that there is clean paperwork, meaning that it complied. It complied. And obviously, if you are lying or misrepresenting in your application, that goes to the kind of credibility to provide clean paperwork. Judge Johnson certainly had the power and authority to look at this constellation of evidence at trial and draw the conclusion he did, which is that LendCare prevailed and it's after acquired evidence defense. We, Your Honors, don't believe you need to get there because we believe the underlying decision should be reversed. But if not, that piece of the damage limitation, we believe, should stand. Thank you. All right. Mr. Roby. Thank you. In order to sustain an after acquired evidence defense, two things – among other things, two things are required. There needs to be evidence that LendCare could indeed have terminated Ms. Balderson and evidence that they would have acted on that. I call it could have and would have evidence. Now, LendCare has certainly presented some evidence that could lead us to believe they had the right to terminate her, but they have not provided any evidence on the latter factor that they would have indeed acted on that. When asked directly at trial, LendCare corporate representative, would you have terminated Ms. Balderson for this omission? The answer was, well, I don't know, maybe. We'd have to discuss it internally. So we believe the court below acted under a misapprehension of law by accepting only could have evidence as sufficient to sustain their after acquired evidence defense. In our papers, we ask for LendCare to identify where, anywhere in the record, is there evidence that LendCare would have terminated her for the omission on her application, and they have failed to identify any such evidence. So, in conclusion, the record is devoid of critical evidence necessary to sustain that defense. And as such, this court should remand the case for the very narrow purpose of fashioning a lost wage damage award in light of the existing trial record. It should affirm the lower court's decision in all other respects. All right. Thank you. All right. As I've mentioned, you guys may have heard that back in the 1930s, Judge Parker established this wonderful practice of coming down and shaking hands and sealing the relationship between the bench and the bar. And we've followed that ever since. And, of course, our protocols now bar us from doing that. But we do come down virtually, so to speak, and shake your hands and thank you for your arguments. And next time you come, I hope we'll be in a position to carry on with our tradition. We'll stand adjourned for the day. This Honorable Court stands adjourned. God save the United States and this Honorable Court.
judges: Paul V. Niemeyer, Julius N. Richardson, Michael Stefan Nachmanoff